FILED
2011 Feb-24  PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL WATSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-1313-NE** |
| | ) | |
| **CITY OF HANCEVILLE,** | ) | |
| **ALABAMA; KATIE WHITLEY;** | ) | |
| **HUBERT JONES; and WAYNE** | ) | |
| **ARMSTRONG,** | ) | |
| | ) | |
| **Defendants.** | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Michael Watson, alleges in this action that he was tortiously injured and his constitutional rights were violated when he was terminated from his position as Fire Chief for defendant, the City of Hanceville, Alabama (the "City").[1] Specifically, he alleges that the City's former mayor, defendant Katie Whitely ("Whitley"), caused him to be terminated because he spoke out publicly about, among other things, Whitley's violation of Alabama's competitive bid laws and, in so doing, both she and the City violated his right to free speech under the First Amendment to the United States Constitution.[2]  Pursuant to 42 U.S.C. § 1983, he seeks damages

---

[1] *See generally* doc. no. 1 (Complaint), *passim.*

[2] *See id.* ¶¶ 34-39 (Count I, "Violation of Constitutional Rights").

from both of these defendants on the basis of this alleged retaliatory termination.[3]

Additionally, he claims that Mayor Whitley, along with City Councilmembers Hubert

Jones and Wayne Armstrong, engaged in a conspiracy to tortiously deprive him of his

rights in violation of Alabama law.[4]  He further asserts additional supplemental state

law claims against all defendants for intentional infliction of emotional distress[5] and

defamation.[6]

     This action is before the court on two motions for summary judgment.  The

first, filed by the City, seeks summary judgment as to the three claims asserted against

it.[7]  The second, filed by the individual defendants, seeks summary judgment as to all

claims asserted against them, except for plaintiff's defamation claim.[8]  Upon careful

consideration of the motions, and in light of the parties' briefs and evidentiary

submissions, the court concludes that defendants' motions for summary judgment are

due to be granted as to all federal claims asserted in this action.  Consequently, the

court will decline to exercise supplemental jurisdiction over the remaining state-law

---

[3] *See id.*

[4] *See id.* ¶¶ 40-42 (Count II, "Civil Conspiracy").

[5] *See id.* ¶¶ 43-47 (Count III, "Intentional Infliction of Emotional Distress").

[6] *See id.* ¶¶ 48-50 (Count IV "Defamation:  Slander and Libel").

[7] Doc. no. 42; *see also generally* doc. no. 45 (Defendant City of Hanceville's Memorandum Brief and Statement of Undisputed Facts in Support of its Motion for Summary Judgment) [hereinafter City's Brief in Support of its Motion for Summary Judgment].

[8] Doc. no. 43; *see also* doc. no. 44 (Brief of Defendants Whitley, Jones, and Armstrong in Support of Motion for Partial Summary Judgment) [hereinafter Brief of Defendants Whitley, Jones, and Armstrong in Support of Motion for Partial Summary Judgment].

claims, and this action shall be dismissed in its entirety.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[9] "[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture

---

[9] Rule 56 was amended, effective December 1, 2010, in conjunction with a general revision of some of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "*will not affect continuing development of the decisional law* construing and applying these phrases." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2010 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th

Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material to an issue affecting the
> outcome of the case*.  The relevant rules of substantive law dictate the
> materiality of a disputed fact.  A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking

"whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  STATEMENT OF FACTS[10]

On December 5, 2005, plaintiff was hired as the Fire Chief and only paid

firefighter for the City of Hanceville's Fire Department.[11]  During his tenure as Fire

Chief, plaintiff states that he "rocked the boat" by challenging what he perceived to

be shortcomings in the City's firefighting capabilities, the City's policies with respect

---

[10]  At the summary judgment stage, the court must "recount the facts in the light most
favorable to . . . the non-moving party."  *Wood v. Kesler*, 323 F.3d 872, 875 n.1 (11th Cir. 2003).
"For that reason, what [is] set out in this opinion as 'the facts' for summary judgment purposes may
not be the actual facts."  *Id.* (alterations supplied); *see also, e.g.*, *Matthews v. Crosby*, 480 F.3d 1265,
1269 (11th Cir. 2007) (same).

[11]  Doc. no. 45, Ex. 2 (Deposition of Michael Watson), at 33 [hereinafter Deposition of
Michael Watson].

to the Fire Department, and the funding of Fire Department operations.[12]  He spoke on these problems at meetings and work sessions held by the City Council.[13]  He also "submitted one or two . . . memos" to the City Council, Mayor Katie Whitley, and the all-volunteer Fire Department requesting information on the department's budget and operating costs.[14]   Plaintiff testified that he had regular conversations with Councilmembers Hubert Jones, a defendant in this action, and Larry Cornett "question[ing] why we were doing the things the way we were," and this "usually resulted in a meeting with the mayor letting [him] know [he] needed to be quiet."[15]

Among the duties shouldered by the City's department heads, including plaintiff, was the purchase of necessary equipment.[16]  When plaintiff first assumed his position as Fire Chief, he determined that the Fire Department was sorely in need of new equipment.[17]   At some point in 2006, plaintiff wrote, and was ultimately awarded, a grant for the purchase of the needed firefighting equipment under the aegis of the Department of Homeland Security's firefighter financial assistance

---

[12] *Id.* at 147-50.

[13] *Id.* at 147.

[14] *Id.* at 83-84, 150-51; *see also* doc. no. 46, Ex. F (memorandum to those persons mentioned above dated August 27, 2006).

[15] Deposition of Michael Watson, at 147-59 (alterations supplied).

[16] *Id.* at 47-53.

[17] *E.g.*, *id.* at 45, 147-48.

program.[18]  *See* 15 U.S.C. § 2229 *et seq.* (establishing the authority for and contours

of the firefighter assistance program).

City policy required that all department heads obtain a purchase order from

City Hall prior to making any purchases.[19]  Even so, plaintiff admits that there were

at least a few occasions on which he purchased equipment for the department without

first acquiring a purchase order from the City.[20]  City policy required that each

purchase be made by separate order, but plaintiff also admits that at some point in late

2006 or early 2007, he made a series of equipment purchases for his department by

reusing two purchase orders multiple times.[21]  This happened again in the middle of

---

[18] *Id.* at 44-47, 49, 64.

[19] *See id.* at 47-53.  Plaintiff acknowledges that the City had a policy requiring all department heads, including the Fire Chief, to obtain a purchase order from City Hall for all purchases made. *See* doc. no. 49 (Plaintiff's Response to Defendant the City of Hanceville's Motion for Summary Judgment), at 2, ¶ 2 [hereinafter Plaintiff's Response to the City's Motion for Summary Judgment]; doc. no. 50 ("Plaintiff's Response to the Defendants Whitley, Jones and Armstrong's Partial Motion for Summary Judgment"), at 2, ¶ 2 [hereinafter Plaintiff's Response to the Individual Defendant's Motion for Partial Summary Judgment]; City's Brief in Support of its Motion for Summary Judgment, at 3, ¶ 2.  Defendants acknowledge that the policy was not written.  *See* Plaintiff's Response to the City's Motion for Summary Judgment, at 4, ¶ 4; doc. no. 60 (City's Reply Brief), at 3, ¶ 4.

[20] Deposition of Michael Watson, at 52-58.

[21] *Id.* at 52-55, 73-74, 117-25 ("It was my understanding the way the Mayor instructed me to purchase things, she gave me two purchase orders, and I made multiple purchases off those purchase orders to accomplish purchasing all the equipment . . . ."); *see also, e.g.*, doc. no. 54, Ex. 5 (Deposition of City Clerk Tania Wilcox), at 59-63; doc. no. 16, at 1 (listing as, among the reasons for warning plaintiff, his alleged violation of the requirement that separate purchases be made with separate purchase orders).  *Nota bene*:  Plaintiff's evidentiary submissions occupy four docket numbers and, confusingly, are labeled first with letters A-F and then numbers 1-29.  Further (and extraordinarily frustratingly for the court), most of plaintiff's exhibits are marked with two differently numbered evidence stickers and contain no internal page numbers or internal page numbers that are not helpful in pinpointing the correct evidentiary reference.  Therefore, to avoid

2007, when plaintiff utilized a single purchase order issued on June 8, 2007, for thirteen separate purchases invoiced between the dates of June 20 and July 12, 2007.[22]

It appears, however, that plaintiff was not the only city official who failed to follow the appropriate procedures in securing equipment required by the City's departments.  On March 29, 2007, for example, former Mayor of the City, and a defendant in this action, Katie Whitely, published a public apology in the *Cullman Times*, in which she admitted that the City's purchase of two police cars without putting the purchase up for competitive bidding violated Alabama law.[23]  More importantly for present purposes, however, plaintiff has testified that on each of the occasions when he made multiple purchases without acquiring separate purchase orders, he did so at the direction of Mayor Whitley.[24]  Plaintiff testified that, when the City was awarded the federal grant he had secured, Mayor Whitley issued him only two purchase orders and instructed him to utilize only those two purchase orders to obtain the tens of thousands of dollars of equipment he had requested in such a way

---

subjecting anyone who may review this opinion to the same infuriating bewilderment the court encountered in parsing plaintiff's evidentiary citations, whenever reference to the evidence plaintiff has submitted is necessary, the court will utilize both the page numbering and docket indicators supplied by the court's Case Management/Electronic Case Files system (*i.e.*, doc. nos. 51-54).

[22] *See* doc. no. 52, Ex. 7, at 1-15; *see also* Deposition of Michael Watson, at 110-112, 116-134.

[23] *See* doc. no. 52, Ex. 2, at 3.

[24] *E.g.*, Deposition of Michael Watson, at 50-52, 112-16, 126-27, 165-68.

that no individual invoice would exceed $7,500.[25]

In June of 2007, plaintiff testified that Mayor Whitley directed him to purchase sixteen sets of "turnout gear" — that is, the outer protective clothing worn by firefighters — after she discovered that many of the City's volunteer firefighters did not have such gear, or were utilizing gear they had from volunteering for the Fire Department in the nearby community of Bangor, Alabama.[26]  According to plaintiff, Mayor Whitley once again instructed him to split the purchase up over multiple invoices less than $ 7,500 apiece, "so it wouldn't hit the budget all at one time," and "she wouldn't have to mess with the [City] Council . . . ."[27]  When the gear and invoices began to arrive, however, Mayor Whitley was upset about the cost.[28]  Plaintiff testified that she told him:

> I'm going to put this stuff in my closet; we need all this to die down because of all this grand jury stuff about me purchasing the police cars; we'll buy half of it now, and we'll buy the other half in the next fiscal year, if all this dies down.[29]

---

[25] *Id.* at 51-56, 167-68.  Perhaps obviously, but irrelevantly for purposes of determining whether defendants' motions for summary judgment and partial summary judgment are due to be granted (*see Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*)), Mayor Whitley vehemently and totally denies each of the allegations that follow.  *See* doc. no. 43, Ex. B (Deposition of Katie Whitley), at 165-75, 310, 353-54, 353-62 [hereinafter Deposition of Katie Whitley].

[26] Deposition of Michael Watson, at 106-12.

[27] *Id.* at 112-16 (alterations supplied).

[28] *See id.* at 137.

[29] *Id.* at 132-136.

However, at some point thereafter, Mayor Whitley told plaintiff that the gear would "have to be bid out," even though it had in fact already been purchased.[30]

Shortly afterwards, on July 31, 2007, the City formally issued plaintiff a written disciplinary report stating that he had wrongfully used a City vehicle for unapproved personal purposes.[31]   The city issued plaintiff a series of three "Employee Warning Reports"[32] approximately a month later, on August 28, 2007.[33]   The violations identified in these reports included "using the same purchase order for multiple purchases," and "giving away fire equipment without going through the proper procedure."[34]   Additionally, plaintiff was verbally disciplined on August 28, 2007 "for the intimidation of [a representative of] Star Fire Equipment, a local business firm from whom . . . he had purchased one set of turn out gear on . . . 6-05-07."[35]

On August 27, 2007, one day prior to this second round of disciplinary action, the City Council voted to reject a bid to provide turnout gear to the City's fire department for the amount of $ 16,570 that had been submitted by the company that

---

[30] *Id.* at 140.

[31] *See* doc. no. 52, Ex. 8, at 1 (describing plaintiff's first disciplinary report); *see also id.* at 5 (more fully describing the grounds for this alleged violation); Deposition of Michael Watson, at 243-47 (plaintiff's discussion of this violation).

[32] Doc. no. 52, Ex. 8, at 1.

[33] *Id.*

[34] *Id.*

[35] *Id.* at 4 (alterations supplied).

plaintiff testified had, in fact, already delivered that gear.[36]  The resolution passed by the Council mandated that plaintiff resubmit the specifications for the gear he sought for the department and solicit a new round of bids from purveyors of turnout gear.[37]

Less than two weeks later, on September 10, 2007, the Hanceville City Council addressed the turnout gear situation more fully.[38]  By a vote of four to one,[39] the Council resolved that the bid specifications for the purchase of turnout gear should be withdrawn in their entirety and that "[a]ny and all turnout gear delivered to the City of Hanceville, pursuant to [the] purchase order of the Fire Chief shall be returned to the vendor of the same immediately."[40]  Resolution 517 provided, as one of the its bases, that:

---

[36] *See* doc. no. 53, Ex. 3 (August 27, 2007 Hanceville City Council Minutes), at 2:

> Mayor Whitley announced there had been one bid for the Fire Department Turn-Out Gear.  The bid was given by MES [from whom the gear in question had already been purchased] in the amount of $16,570.00
>
> Councilor Jones Motioned to reject the bid, re-spec the bid and re-bid the gear.  Motion Seconded by Councilor Armstrong.  Motion carried.

[37] *Id.*

[38] *See* doc. no. 53, Ex. 7 (Resolution No. 517 of the City Council of Hanceville); *see also* Deposition of Katie Whitley, at 174-75.

[39] *See* doc. no. 53, Ex. K (September 24, 2007 Hanceville City Council Minutes), at 2 (reflecting a carried motion to approve the minutes of the previous meeting after correction to reflect that Councilor Walls voted against adoption of Resolution No. 517); *see also* doc. no. 53, Ex. 3, at 2; doc. no. 53, Ex. 7, at 1.

[40] Doc. no. 53, Ex. 7, at 1 (alterations supplied).

> [T]he Chief of the Hanceville Fire Department purchase ordered said
> turnout gear without following the policies and procedures of
> Hanceville, without obtaining the approval of the City Council of
> Hanceville for said purchase, and without having the purchase bid by
> and through the City Council of Hanceville according to legal
> requirements . . . .[41]

Plaintiff testified that, because the council had, in essence, "passed a resolution saying that [he] had violated bid law — the bid law process, or the City's purchasing procedure," he felt that the Council was "basically hanging [him] on the cross."[42]

The following day, plaintiff said that Ms. Karen Williamson, a reporter for the *Cullman Times*, contacted him to ask about the possible bid law violations.[43] Plaintiff stated that he told Ms. Williamson that keeping invoice values under the dollar amount that would require a competitive bidding process and a City Council vote was "the purchasing procedure that . . . [he] had followed before."[44] He also believes he "may have" given her documentation showing that he used the same deceitful purchase methods with respect to purchases of equipment in late 2006 and early 2007 using the federal grant money he had secured.[45] Most importantly for present purposes, because he felt Resolution 517 "put[] a bad light on [his] reputation," and,

---

[41] *Id.* (second "WHEREAS" clause); *see also* Deposition of Michael Watson, at 159-62, 166-67.

[42] Deposition of Michael Watson, at 159-62 (alterations supplied).

[43] *Id.* at 157-63.

[44] *See id.* at 162-63 (alterations supplied).

[45] *Id.* at 50-51, 157-59.

11

therefore, that he needed to "defend[] [him]self," he informed the reporter that he committed these violations at the direction of Mayor Whitley.[46]

One day later, on September 12, 2007, two days after the passage of Resolution 517, plaintiff delivered a letter to Cullman County District Attorney Wilson Blaylock, which stated: "As you may be aware this administration has admit ally [sic] broken the State Bid Law in the past and I can prove this has been done again."[47]  The letter informed District Attorney Blaylock that he was "writing to express his concern that" the "Resolution passed by the City Council" had "put[] a bad light on [his] reputation and single[d him] out to have made an illegal purchase."[48]  He requested an "opportunity to set up an appointment to go over the issues with" District Attorney

---

[46] *Id.* at 157-67 (alterations supplied).

[47] Doc. no. 46, Ex. H (letter from plaintiff to Cullman District Attorney Blaylock), at 1. Notably, it is by no means clear when District Attorney Blaylock actually received this letter or even whether plaintiff sent the letter.  The letter is dated September 12, 2007, but none of the parties has provided any evidence indicating whether that corresponds to the date it was sent *via* the post or hand-delivered.  *Id.*  Plaintiff does testify that he "sent" the letter to the district attorney, but, again, neither party has pointed to any testimony describing when or by what means.  *See* Deposition of Michael Watson, at 166-67.  Nevertheless, plaintiff made the factual assertion that plaintiff "[o]n September 12 2007, Watson delivers [sic] a letter to Cullman District Attorney" and cites to the letter as supposed support for this assertion.  Plaintiff's Response to the City's Motion for Summary Judgment, at 7, ¶ 16; Plaintiff's Response to the Individual Defendants' Motion for Partial Summary Judgment, at 8-9, ¶ 16.  Neither defendant objected.  Doc. no. 59 (Individual Defendants' Reply Brief), at 2, ¶ 16; doc. no. 60 (City's Reply Brief), at 5, ¶ 16.  Accordingly, the court deems the fact that the letter was delivered on September 12, 2007 to have been admitted.  It is, however, clear that, notwithstanding plaintiff's apparent assertion that he was terminated in part as retaliation for writing this letter, he has presented no evidence that *any defendant knew of the existence of this letter* before he was terminated.

[48] Doc. no. 46, Ex. H, at 1 (alterations supplied).

12

Blaylock.[49]  Plaintiff testified that he "wrote this simply to try to absolve [him]self because [he] didn't understand all these bid laws . . . [and] had never been explained [sic] everything in resolution number 517 regarding how the City would purchase something."[50]

At some point after plaintiff's conversation with *Cullman Times* reporter Karen Williamson, Ms. Williamson contacted Hanceville Police Chief Philip Bray and disclosed to him what she had learned from plaintiff, including his allegations against Mayor Whitley.[51]  On September 12, 2007, Ms. Williamson gave Chief Bray copies of the documents plaintiff had given her evidencing possible bid law violations in the purchase of fire department equipment in 2006 and 2007.[52]

That same day, Chief Bray interviewed Mayor Whitley and, according to his investigation report, she "related that she did instruct [plaintiff] to make incremental purchases of equipment as long as money was available; however, those incremental purchases were not to exceed a *total* of $ 7,500."[53]  Mayor Whitley echoed the

---

[49] *Id.*

[50] Deposition of Michael Watson, at 167 (alterations supplied).

[51] Doc. no. 54, Ex. 2, at 4-5.

[52] *See id.* at 5.

[53] *Id.* at 5-6 (alterations and emphasis supplied).  Councilmember Barnett asserted that she similarly believed that plaintiff had been advised that the incremental purchases were not to exceed $ 7,500 *in total*.  *See id.* at 5.  Mayor Whitley denies the veracity of many of the statements in Chief Bray's report attributed to her and claims that she made no such comments to Chief Bray.  *See* Deposition of Katie Whitley, at 353-62.

statements of City Council Member Selma Barnett, in that plaintiff's purchase beyond that total amount had far exceeded the fire department's budget allotment.[54] Mayor Whitley also conveyed that plaintiff had "been written up by [her] on several occasions based on his misconduct," but that "she did not know why [he] was making these allegations that she was attempting to circumvent the bid law process."[55]  At the close of the interview, Mayor Whitley asked Chief Bray to refrain from notifying the Alabama Attorney General's Office until the following day to permit her to discuss the matter with City Attorney Ed Coey.[56]

On September 13, the following day, Chief Bray briefed City Attorney Coey "on all aspects of his investigation to date," and informed him that he would be contacting the Office of the Alabama Attorney General.[57]  The following day, September 14, 2007, personnel from the Attorney General's Office directed Chief Bray to contact the Cullman County District Attorney's Office.[58]

Also on September 14, plaintiff wrote a memorandum addressed to Mayor Whitley, the City Clerk, and certain "Community Points of Contacts [sic]" expressing concern about remarks he testified Mayor Whitley and City Councilmembers made

---

[54] Doc. no. 54, Ex. 2, at at 5-6.

[55] *Id.*

[56] *Id.* at 6.

[57] *Id.*

[58] *Id.*

that he regarded as denigrating volunteer firefighters.[59]  It is unclear whether and, if so, to whom this document was delivered.[60]

On September 14, 2007, four days after the City Council had passed Resolution 517, Mayor Whitely suspended plaintiff, with pay,[61] "pending a hearing on [his] termination as Chief by the City Council Committee responsible for oversight of the Fire Department Office of Chief to be conducted on September 21, 2007, at 9:00 a.m."[62]  The Notice of Suspension stated that the bases for the suspension were as follows:

* Use of city vehicle for personal purposes;

* Unauthorized giving away of city fire equipment without following proper procedure;

* Intimidation of a vendor doing business with the City of Hanceville;

* Unauthorized multiple usage of purchase orders without following proper procedure, cumulative; and

* Purchasing equipment without purchase orders and without following procedure, cumulative.[63]

---

[59] *See* Deposition of Michael Watson, at 150-51; doc. no. 46, Ex. G, at 1.

[60] Neither defendants nor plaintiff address to whom the memorandum was sent.  Indeed, plaintiff does not mention the memo at all.  *See* Plaintiff's Response to the City's Motion for Summary Judgment, *passim*; Plaintiff's Response to the Individual Defendants' Motion for Partial Summary Judgment, *passim*; *see also* note 47, *supra*.

[61] Deposition of Katie Whitley, at 365-66.

[62] Doc. no. 46, Ex. I, at 1.

[63] *Id.*

One week later, on September 21, 2007, a disciplinary hearing was held before the City's personnel committee, comprised of City Councilmembers Selma Barnett, Hubert Jones, and Larry Cornett, the latter two of whom are defendants in this action.[64]  The hearing was open to the public and was apparently so well-attended by both members of the media and the public at large, that the attendance overflowed "the biggest room" the City could secure.[65]  Plaintiff was present and was represented by the same counsel representing him in this action.[66]   City Attorney Coey represented the City.[67]  Both sides were permitted to present "witnesses who [were] under oath" and documentary evidence.[68]   Both sides were permitted direct examination, cross-examination, re-direct, and re-cross of each of the witnesses, and the committee members were permitted to ask their own questions.[69]  Evidence tendered at the hearing was expressly limited to that relevant to the five reasons listed in the Notice of Suspension.[70]   Including plaintiff, six different witnesses were

---

[64] Doc. no. 46, Ex. J (transcript of September 24, 2007 Disciplinary Hearing), at 4 [hereinafter Disciplinary Hearing Transcript].

[65] *See* Disciplinary Hearing Transcript, at 2-3, 8-9.

[66] *Id.* at 4.

[67] *Id.* at 2.

[68] *Id.* at 7-9.

[69] *Id.* at 9; *see also, e.g.*, *id.* at 16 (first cross-examination by plaintiff's counsel Mr. Haynes); *id.* at 18 (redirect by City Attorney Coey); *id.* at 32 (direct examination of plaintiff appearing as a witness on his own behalf by plaintiff's present counsel Mr. Haynes); *id.* at 41 (cross-examination of plaintiff by City Attorney Coey); *id.* at 86 (cross-examination of witness presented on behalf of plaintiff by City Attorney Coey); *id.* at 109 (redirect of plaintiff by City Attorney Coey).

[70] Disciplinary Hearing Transcript, at 9.

presented, half of whom were questioned more than once.[71]  It is unclear how long the

hearing lasted, but the transcript extends approximately 140 pages.[72]

At a meeting of the Hanceville City Council held three days later, on

September 24, 2007, the personnel committee-members each gave statements about

the conclusions they drew from the disciplinary hearing.[73]  A motion was made "for

the suspension of [plaintiff] to stand," and that motion carried, apparently without

opposition.[74]   Councilmember Larry Cornett then moved for the immediate

termination of plaintiff from his position as Fire Chief, and the five-member council

voted 4-1 in favor.[75]   Immediately thereafter, the Council voted, apparently

unanimously, to initiate an "independent investigation, inventory and audit" of

plaintiff's activities during his tenure as Fire Chief.[76]

---

[71] Disciplinary Hearing Transcript, at 11 (start page for the testimony of Mr. Terry Sellers, called by the City); *id.* at 19, 45 (start pages for the testimony of Hanceville Police Lieutenant Jimmy Rodgers, called by the City); *id.* at 32, 66, 90, 11 (start pages for the testimony of plaintiff, called on his own behalf); *id.* at 50, 75 (start pages for the testimony of Mr. George Crittenden, called by the City); *id.* at 79-80 (start pages for the testimony of Mr. Dwayne Powell, called by the City); *id.* at 84 (start page for the testimony of Volunteer Fireman Jason Townes, called by plaintiff).

[72] *See id. passim*.

[73] Doc. no. 46, Ex. K, at 3.  *Note*:  because reference to the internal page numbers in this document would inevitably result in confusion, the page numbers assigned by the Case Management/Electronic Case Files system will be utilized.

[74] *Id.* at 4.

[75] *Id.*

[76] *Id.* Plaintiff includes in his statement of facts myriad other assertions regarding occurrences *after* he was terminated.  *See* Plaintiff's Response to the City's Motion for Summary Judgment, ¶¶ 23-26; Plaintiff's Response to the Individual Defendants' Motion for Partial Summary Judgment, ¶¶ 23-26.  These facts could only be relevant to plaintiff's defamation claim.  Yet plaintiff expressly abandoned his defamation claim against the City, Plaintiff's Response to the City's Motion for

## III.  DISCUSSION

### A.    Plaintiff's Claims Against the City of Hanceville, Alabama

### 1.    Plaintiff's state-law claims against the City

Two of the three state-law causes of action in plaintiff's complaint, those for defamation and intentional infliction of emotional distress, are asserted "against all defendants . . . ."[77]  Defendant the City of Hanceville spent nearly seven pages of its brief meticulously setting forth the bases upon which it claimed entitlement to summary judgment as to both of those claims.[78]  Yet, in response to the City's well-articulated argument, plaintiff attempts to effect an untimely amendment of his complaint by simply stating that "[t]hose claims [were] alleged against the individual defendants [only] . . . ."[79]  Though plaintiff's assertion in brief is demonstrably contrary to the allegations of his complaint,[80] it effectively amounts to abandonment

---

Summary Judgment, at 25, and the individual defendants did not move for summary judgment as to plaintiff's defamation claim.  *See* doc. no. 43 (Motion for Partial Summary Judgment by Katie Whitley, Hubert Jones, and Wayne Armstrong), at 1 ("The defendants seek a summary judgment [sic] on all claims other than the Alabama state law claim for defamation contained in Count Four of the complaint.").  Thus, since these facts are utterly irrelevant, the court will not further bloat this already lengthy opinion by including them.

[77] Doc. no. 1 (Complaint), ¶¶ 44, 49.

[78] City's Brief in Support of its Motion for Summary Judgment, at 14-20.

[79] Plaintiff's Response to the City's Motion for Summary Judgment, at 25 (alterations supplied).

[80] *E.g.*, doc. no. 1 (Complaint), ¶ 33 ("The City . . . published false accusations that Watson engaged in unsafe and immoral practices while acting as fire chief.  *See also supra* note 77 and accompanying text.

of any state-law claim against the City.  Accordingly, summary judgment is due to be

granted in favor of the City as to plaintiff's defamation and intentional infliction of

emotional distress claims.

### 2.    Plaintiff's First Amendment retaliation claim against the City

The only remaining claim against the City is plaintiff's claim under 42 U.S.C.

§ 1983 that he was terminated from his position as Fire Chief in retaliation for

exercising his First Amendment right "to speak as a citizen addressing matters of

public concern."  *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).[81]  "To establish a

First Amendment retaliation claim, a plaintiff must show that (1) [his] speech was

constitutionally protected; (2) []he suffered adverse conduct that would likely deter

a person of ordinary firmness from engaging in such speech; and (3) there was a

causal relationship between the adverse conduct and the protected speech."  *Castle*

*v. Appalachian Technical College*, No. 10-11546, — F.3d —, 2011 WL 240719, at

*3 (11th Cir. Jan. 27, 2011) (alterations supplied).  Stated another way, "the employee

must show . . . that:  (1) the employee's speech is on a matter of public concern; (2)

the employee's First Amendment interest in engaging in the speech outweighs the

employer's interest in prohibiting the speech to promote the efficiency of the public

---

[81] *See* Plaintiff's Response to the City's Motion for Summary Judgment, at 12-18 (arguing that plaintiff's speech was public in character, thereby entitling it to some degree of First Amendment protection); *see also* doc. no. 1 (Complaint), ¶¶ 35-39 (First Amendment Retaliation claim).

services it performs through its employees; and (3) the employee's speech played a

substantial part in the employer's decision to demote or discharge the employee."

*Anderson v. Burke County*, 239 F.3d 1216, 1219 (11th Cir. 2001).   "Once the

employee succeeds in showing the preceding factors, the burden then shifts to the

employer to show, by a preponderance of the evidence, that it would have reached the

same decision . . .  even in the absence of the protected conduct."  *Battle v. Board of*

*Regents for Georgia*, 468 F.3d 755, 760 (11th Cir. 2006) (quotation marks omitted)

(quoting *Anderson*, 239 F.3d at 1219 (quoting, in turn, *Mount Healthy City School*

*District Board of Education v. Doyle*, 429 U.S. 274, 297 (1977)).

It is a cardinal rule of § 1983 actions that "a municipal entity is liable under §

1983 only if a municipal ' *policy or custom*' caused a plaintiff to be deprived of a

federal right."  *Los Angeles County v. Humphries*, — U.S. —, 131 S. Ct. 447, 450

(2010) (emphasis in original) (quoting *Monell v. New York City Department of Social*

*Services*, 436 U.S. 658, 694 (1978).  Liability under § 1983 for constitutional

violations will only attach to a municipality, like the City, "where [the] municipality's

*own* violations were at issue but not where only the violations of *others* were at

issue."  *Id.* at 453 (emphasis in original) (alterations supplied).  Thus, "[t]o impose

§ 1983 liability on a municipality, a plaintiff must show:  (1) that his constitutional

rights were violated; (2) that the municipality had a custom or policy that constituted

deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."  *T.W. ex rel. Wilson v. School Board of Seminole County*, 610 F.3d 588, 603 (11th Cir. 2010) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)).

A plaintiff seeking to impose liability upon a municipal entity has the choice of three distinct avenues by which to satisfy the "policy or custom" requirement: proof that the "constitutional tort[] result[ed] [1] from an official government policy, [2] the actions of an official fairly deemed to represent government policy, or [3] a custom or practice so pervasive and well-settled that it assumes the force of law." *Denno v. School Board of Volusia County, Florida*, 218 F.3d 1267, 1276 (11th Cir. 2000) (alterations supplied).  Plaintiff has never squarely identified the theory upon which he claims that the City may be held liable.  Indeed, confoundingly, both plaintiff and the City have conflated their discussions of the policy or custom requirement with the above-described analysis dictated by *Mount Healthy*, regarding whether the City would have reached the same decision regardless of any demonstrated unconstitutional motive.[82]  The existence of a basis in law for the City's

---

[82] *See* City's Brief in Support of its Motion for Summary Judgment, at 13; Plaintiff's Response to the City's Motion for Summary Judgment, at 24-25.  Bafflingly, the City further agglomerates into its hodgepodge discussion still a third, conceptually distinct element:  the causal requirement of an employee's *prima facie* case in proving a First Amendment retaliatory discharge claim.  *See* City's Brief in Support of its Motion for Summary Judgment, at 45. The court has attempted to divine the underlying bases for the parties scanty contentions on this dispositive element

liability is, however, an analytically distinct, logically antecedent question universal to all species of § 1983 claims against municipalities and, therefore, should not be commingled with the merits of the claim itself.  Still, both the evidence adduced and a close reading of that portion of the parties' briefs that can be fairly read as addressed to the issue (convoluted and scant though it may be) makes plain that the only theory upon which plaintiff could reasonably seek to hold the City liable is that he was terminated pursuant to the decision of "an official fairly deemed to represent government policy."  *Doe v. School Board of Broward County, Florida*, 604 F.3d 1248, 1263 (11th Cir. 2010) (citation and internal quotation marks omitted).

"Municipal liability may arise with regards to an employment decision, such as a termination, provided that the decisionmaker 'posseses *final authority* to establish *municipal policy* with respect to the action ordered.'"  *Quinn v. Monroe County*, 330 F.3d 1320, 1325 (11th Cir. 2003) (emphasis in original) (quoting *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481 (1989)).  "[O]nly municipal officers or groups who have final policymaking authority may subject the municipality to liability."  *Campbell v. Rainbow City, Alabama*, 434 F.3d 1306, 1312 (11th Cir. 2006).  "Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful

---

so that it can render a just ruling.  To the extent that  the court mischaracterizes what the parties may subjectively have intended (but failed) to say, that flaw is of the parties' own creation.

administrative review." *Manor Healthcare Corp. v. Lamelo*, 929 F.2d 633, 638 (11th Cir. 1991). Whether a group or an individual is a "final policymaker" is determined by reference to "state and local positive law" or "custom or usage having the force of law." *Jett v. Dallas Independent School Disrict*, 491 U.S. 701, 737 (1989). The determination of who has such final, unreviewable policymaking authority and, thus, whose actions may fairly be directly attributable to the governmental entity that employs him, "is a question of law to be resolved by the trial court judge." *Mandell v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989). Plaintiff bears the burden to demonstrate *both* who is a final policymaker *and* that the policymaker violated his constitutional rights. *E.g.*, *Copper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005).

Here, plaintiff effectively concedes, as the evidence dictates he must, that the policymaker with respect to his termination was the personnel committee and, ultimately, the City Council of Hanceville, *as entities*.[83] The City, therefore, "can be subject to liability only if [these entities] acted with an unconstitutional motive." *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) (*per curiam*). Moreover, plaintiff has pointed to absolutely no evidence whatsoever that any individual member of the committee or council, much less those entities as a whole, harbored retaliatory animus towards him. Instead, plaintiff argues a "cat's paw"

---

[83] *See* Plaintiff's Response to the City's Motion for Summary Judgment, at 24.

theory — specifically, that Mayor Whitley recommended his termination to these entities in retaliation for his protected speech, and that the committee and Council ultimately terminated him without "independent investigation into the formal charges against [him]."[84]

Plaintiff's argument fails for three reasons.  First, except for a district court opinion that, while analyzing a § 1983 claim, relies exclusively upon Title VII decisions, the cases that plaintiff cites in support of his "cat's paw" theory arose in the context of claims pursuant to Title VII, *not* § 1983.[85]  However, the Seventh Circuit has recently, and this court believes with good reason, "question[ed] whether such a theory is applicable for purposes of establishing § 1983 municipal liability." *Waters v. City of Chicago*, 580 F.3d 575, 586 (7th Cir. 2009).  "The theory is steeped in agency principles which are applied in the Title VII context, *see, e.g., Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) ('Congress has directed federal courts to interpret Title VII based on agency principles'), but don't apply to § 1983 municipal liability." *Waters*, 580 F.3d at 586 (parallel citations omitted). *Respondeat*

---

[84] *Id.*

[85] *See id.* (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328 (11th Cir. 1999) (*per curiam*) (considering an "appeal . . . under Title VII"); *Llampallas v. Mini-Circuits Lab, Inc.*, 163 F.3d 1236, 1248-49 (11th Cir. 1998) (Title VII case not even involving a governmental entity); *Sherrod v. School Bd. of Palm Beach Cnty.*, 703 F. Supp. 2d 1279, 1300 (S.D. Fla. 2010) (wrongly, the court's view, transposing Title VII caselaw into its analysis of *Monell*'s § 1983 policy or custom requirement).

*superior*, the central liability doctrine in agent-principle theory, has been soundly (and repeatedly) rejected as a basis for imposition of municipal liability under § 1983. *E.g.*, *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997) (reiterating that the Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior*"); *Thomas v. Bryant*, 614 F.3d 1288, 1315 (11th Cir. 2010) ("[N]either respondeat superior nor vicarious liability exists under § 1983.") (quoting *Cook ex. rel. Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1115-16 (11th Cir. 2005)).   In fact, the Eleventh Circuit recently addressed a case involving both a § 1981 retaliation claim, identical in all relevant respects to a Title VII claim, and a § 1983 First Amendment retaliation claim, and, quite notably, addressed a "cat's paw" theory under the former, but not under the latter.  *Tucker v. Talladega City Schools*, 171 Fed. Appx. 289, 296-300 (11th Cir. 2006).  Thus, the court is skeptical about whether the "cat's paw" theory has any relevance whatsoever in the context of municipal liability under § 1983.

Second, to the extent plaintiff's cat's paw theory is a clumsy attempt to characterize the personnel committee and the City Council as a mere "rubber stamps" that assertion is both legally and factually deficient.[86]   The Eleventh Circuit has

---

[86] Paradoxically, plaintiff's brief in response to the City of Hanceville's motion for summary judgment, doc. no. 49, makes no mention of a "rubber stamp" theory, *see* doc. no. 49, at 25, but his brief in response to the individual defendants' motion for partial summary judgment, doc. no. 50, which is otherwise a verbatim copy with respect to the § 1983 arguments, *does* devote a paragraph

indicated that a municipality may be liable where a final policymaker for the municipality is a "mere conduit" for an otherwise improper decision. *See, e.g.*, *Quinn*, 330 F.3d at 1327; *see also Kamensky v. Dean*, 878 Fed. Appx. 878, 880 (11th Cir. 2005). In discussing a Fifth Circuit case addressing municipal liability based upon a "rubber stamp" theory, however, the Eleventh Circuit noted a distinction between situations in which the official alleged to have harbored retaliatory motive "had the authorty merely to *reccomend* [the employee's] termination," and those where the "termination was effective upon [the official's] order (without further review or approval of higher authority required)" but was subject to precatory administrative review. *Id.* at 1327-28 (emphasis supplied) (citing *Hitt v. Connell*, 301 F.3d 240, 247-49 (5th Cir. 2002)). Here, the individual who plaintiff claims acted with a retaliatory motive, Mayor Whitley, merely suspended plaintiff pending a decision actually made by the City Council itself.[87] The Council did not merely "review" a termination decision it had delegated to Mayor Whitley — the Council *made the decision*. *Cf. Campbell*, 434 F.3d at 1313 (rejecting Fist Amendment claim where the evidence offered indicated only that a Mayor with allegedly

---

the "rubber stamp" theory. *Id.* at 27. Out of an abundance of solicitude, the court has considered plaintiff's "rubber stamp" arguments as made also in opposition to the City's motion for summary judgment.

[87] *See* doc. no. 46, Ex. I, at 1 ("This suspension is pending a hearing on your termination as Chief by the City Council Committee responsible for oversight of the Fire Department Office of Chief . . . .").

unconstitutional motive "influenced and controlled" the actual decisionmaker, but was not himself the actual decisionmaker); *Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("[E]ven if [the official acting with the "unconstitutional motive"] was given the power to select" the individuals to be terminated, the decision still had to "be accepted by a majority of the board") (alteration supplied).

Even assuming that Mayor Whitley recommended plaintiff be terminated in retaliation for his protected speech, the City would be liable only if its "final policymaker . . . ratif[ied] not only the decision itself, *but also the unconstitutional basis for it*." *Id.* (alterations supplied) (citing *Gattis v. Brice*, 136 F.3d 724, 747 (11th Cir. 1998).  Though *dicta* to the contrary appear in some decisions, the court doubts that a City could be liable on the basis that its policymakers applied a "rubber stamp" to a decision when no preexisting decision actually existed.  *Compare Quinn*, 330 F.3d at 1326-28, *and Matthews*, 294 F.3d at 1297-98, *with Kamensky*, 148 Fed. Appx. at 880-81.  Even where a process culminating in termination was initiated by an individual with an improper motive, provided the policymaker actually making the decision did not share that motive, the employing municipal entity cannot be liable. *See Matthews*, 294 F.3d at 1297-98.

Moreover, and crucially, even accepting for the purposes of argument plaintiff's metaphysical suggestion that Mayor Whitley was, in fact, a decisionmaker,

the Council decided to terminate plaintiff, just as in *Quinn*, based upon a "full adversarial and evidentiary hearing . . . during which the parties were each represented by council and had the opportunity present and cross-examine witnesses." *Quinn*, 330 F.3d at 1236.  Indeed, the personnel committee hearing plaintiff received was even more extensive and protective of his rights than the one afforded to the plaintiff in *Quinn*.  The hearing was so well-attended by the public (who, it almost goes without saying, elected each of the officials who ultimately made the decision with respect to plaintiff's termination) and local media, that the largest room the City could secure overflowed its capacity.[88]   Two of the members of the personnel committee were the very individuals to whom Mayor Whitley allegedly had tried to prevent plaintiff from speaking regarding his concerns with the state of the Fire Department.[89]   The personnel committee-members present at that hearing unanimously advocated and voted in favor of plaintiff's termination at a meeting of the City Council held three days later.[90]  Not only was there "an actual 'opportunity' for 'meaningful' review" of the decision to terminate plaintiff, *Hollman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1292 (11th Cir. 2004) (quoting *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1295 (11th Cir. 2000)), there was *actual*

---

[88] Disciplinary Hearing Transcript, at 3.

[89] Deposition of Michael Watson, at 147-50.

[90] Doc. no. 46, Ex. K, at 3-4.

28

*meaningful* review, undertaken in an extraordinarily thorough, deliberative, and public fashion.

Plaintiff "points to no cognizable defect in the proceedings, nor has []he provided evidence that the Council approved any improper motive that [Mayor Whitley] may have had." *Quinn*, 330 F.3d at 1326.  He simply points to testimony indicating that the Council "[p]retty much did what [Mayor Whitley] recommended . . . ."[91]  As against the evidentiary hearing that indisputably occurred, that is patently insufficient.  *E.g.*, Campbell, 434 F.3d at 1313 (rejecting evidence that "Mayor . . . influenced and controlled the Planning Commission" as insufficient to support imputing unconstitutional motive of mayor through the commission to the City); *Matthews*, 434 F.3d at 1306 ("That [two commissioners] may have known about the unconstitutional basis of [the third's] selection and vote or that [he] may have affected [their] votes by his influence is not enough to show that they ratified the unlawful basis by voting for the [termination].") (alterations supplied).  Accordingly, he has not provided sufficient evidence that the Council's decision to terminate him

---

[91] The only real evidence (as opposed to trifling arguments dealt with in the ensuing paragraph) that plaintiff has provided to support this theory at all is the testimony of City Clerk Tania Wilcox that "[t]he Council pretty much did what [Mayor Whitley] recommended . . . ." Doc. no. 54, Ex. 5 (Deposition of Tania Wilcox), at 27-28.  For the reasons discussed above, even if this statement were not qualified by Clerk Wilcox's "pretty much" language, it would still be insufficient to obviate the import of the disciplinary hearing and council vote in decoupling the causal tie plaintiff must prove to establish a policy or custom.

merely "rubber-stamped" an improper motive.

Finally, plaintiff contends that the fact that two of the four councilmembers who voted in favor of his termination, "Councilman Jones and Cornett [sic] who also sat on the so called personnel committee were witnesses to [plaintiff's] earlier discipline in July and August for [the same offenses] they were reviewing for termination reasons [sic] in September."[92] Plaintiff seems thereby to contend that he has satisfied his burden of demonstrating a municipal policy or custom by creating an issue of fact as to whether those two individuals knew the reasons proffered by the Mayor to be pretext. First, simply because plaintiff had previously received written or verbal warnings for the violations addressed at his later disciplinary hearing, that in no way deprives those violations of their cumulative validity or precluded the City Council from relying upon them in its subsequent decision to terminate plaintiff. Further, plaintiff's assertion that he "had already been disciplined for every reason given for his suspension/termination"[93] is unsupported by the evidence — plaintiff has produced documents showing he was disciplined for four separate violations and terminated for five, indicating that he had *not* previously been disciplined for "[p]urchasing equipment without purchase orders and without following proper

---

[92] Plaintiff's Response to the City's Motion for Summary Judgment, at 24-25.

[93] *Id.* at 23.

procedure, cumulative," a violation he now admits.[94]   Even assuming Councilmembers Jones and Cornett knew Mayor Whitley had recommended plaintiff's termination for an unconstitutional reason, a fact unsupported by any evidence, knowledge alone is not enough. *See Matthews*, 294 F.3d at 1298 (holding evidence that two of three commissioners who voted for termination "may have known about the unconstitutional basis" of the third and even have been "influenc[ed] by him "not enough to show that they ratified the" unconstitutional reason). Moreover, even had Councilmembers Jones and Cornett *shared* Mayor Whitley's unconstitutional motive for plaintiff's termination, a proposition that seems affirmatively *contradicted* by the evidence, that alone would still be entirely insufficient to pin liability upon the City. *See, e.g.*, *id* at 1297-98; *Mason v. Villiage of El Portal*, 240 F.3d 1337, 1339 (11th Cir. 2002) ("[T]here can be no municipal liability unless *all three* members of the council who voted against reappointing [p]laintiff *shared the illegal motive*.") (emphasis supplied).

Finding absolutely no basis upon which the City could be held liable, summary judgment is due to be granted as to plaintiff's § 1983 claim against the City for retaliatory discharge in violation of his First Amendment right to speak as a citizen on matters of public concern.

---

[94] Doc. no. 46, Ex. I, at 1; *see also, e.g.*, Deposition of Michael Watson, at 53-68.

**B.    Plaintiff's Claims Against the Individual Defendants**

**1.    State-law claims that plaintiff has abandoned**

Plaintiff asserts three claims under Alabama law against the individual defendants:  intentional infliction of emotional distress, civil conspiracy, and defamation.[95]  Defendants have not moved for summary judgment as to plaintiff's defamation claim.[96]  In response to the individual defendants' motion for partial summary judgment, plaintiff expressly "abandon[ed] his claim of intentional infliction of emotional distress and conspiracy."[97]  Accordingly, the motion for summary judgment filed by Mayor Whitley, Councilmember Jones, and Councilmember Armstrong is due to be granted with respect to those two claims.

**2.    Plaintiff's First Amendment retaliation claim against Whitley**

Among the individual defendants, plaintiff alleges his claim that he was terminated in retaliation for exercising his First Amendment right to speak only against the former Mayor of the City of Hanceville, Katie Whitley.[98]  In his

---

[95] Doc. no. 1 (Complaint), ¶¶ 40-50.

[96] Doc. no. 43 (Motion for Partial Summary Judgment by Katie Whitley, Hubert Jones, and Wayne Armstrong), at 1 ("The defendants seek a summary judgment [sic] on all claims other than the Alabama state law claim for defamation contained in Count Four of the complaint.").

[97] Plaintiff's Response to the Individual Defendants' Motion for Partial Summary Judgment, at 31.

[98] *See* doc. no. 1 (Complaint), ¶ 35.  Plaintiff asserts his claims against Mayor Whitley in both her official and individual capacities.  "[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply 'another way of pleading an action against an entity of which an officer is an agent.'  Such suits against municipal officers are therefore, in actuality, suits directly

complaint, plaintiff claims that he was terminated for engaging in protected activity

— *i.e.*, speech as a citizen on a matter of public concern — and that Mayor Whitley

should be individually liable for this unconstitutional act.[99]   Plaintiff is forced, albeit

in not so many words, to acknowledge that Mayor Whitley was not the actual

decisionmaker with respect to his termination.[100]    Mayor Whitley merely

---

against the city that the officer represents." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (footnote, citation, and internal quotation marks omitted)).  The court has already dispensed with plaintiff's claim against the City and, therefore, plaintiff's "official capacity" claim against Mayor Whitley.  Therefore, the court in this section only addresses plaintiff's § 1983 claim against Mayor Whitley in her individual capacity.

[99] As noted above, proof of a claim of First Amendment retaliation by a government employer against an employee requires evidence that "the employee's speech played a substantial part in the employer's decision to demote or discharge the employee." *Anderson v. Burke County*, 239 F.3d 1216, 1219 (11th Cir. 2001).  "In the employment context, the required adverse action in a [First Amendment] retaliation claim is an 'adverse employment action.'" *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005) (citing *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004), *cert. denied*, 544 U.S. 976, 125 S. Ct. 1850, 161 L. Ed.2d 727 (2005)).  The only adverse employment action expressly identified in the complaint as having been driven by unconstitutionally retaliatory animus is plaintiff's termination.  Doc. no. 1 (Complaint), ¶ 37.  Furthermore, the court does not believe that any of the other actions taken by the City or Mayor Whitley in this action would satisfy the "adverse employment action" element.  In any event, plaintiff has set forth absolutely no reasoning to support any assertion that his claim rests upon an action other than his termination and, accordingly, any argument to the contrary is waived.  *See Norelus v. Dennys, Inc.*, 628 F.3d 1270, 1297 n.9 (11th Cir. 2010) ("[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.") (citation and quotation marks omitted); *United States v. Docampo*, 573 F.3d 1091, 1103 (11th Cir. 2009) (reiterating the well-worn principle that a court should "decline to assume the role of counsel and make a new argument for" the parties); *see also Lyes v. City of Riviera Beach, Fla.*, 126 F.3d 1380, 1388 (11th Cir. 1997) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . .").

[100] *See* Plaintiff's Response to the Individual Defendants' Motion for Summary Judgment, at 26.  Plaintiff does not argue that Mayor Whitley can be individually liable because she actually made the decision, but, instead, begins his discussion of the causal element by stating that "[w]here the person who recommended or initiated the discipline is not the same person as the actual decision-maker, an employee can invoke the 'cat's paw' theory to establish this link." *Id.*

recommended that he be terminated.  Even so, plaintiff argues that "Whitley knew a majority of the Council would approve her decision to remove [him] and she should not be allowed to escape liability for the ill-motives by hiding behind the skirt of the Council."[101]  In sum and substance, plaintiff advances a kind of reverse cat's paw theory — namely, that Mayor Whitley's recommendation that plaintiff be terminated was infected with unconstitutional animus, the board "rubber-stamped" that recommendation, and, therefore, liability should flow backwards from that actual decision to her recommendation.

While clever, the Eleventh Circuit has expressed considerable skepticism about use of such a theory as a basis for assigning individual liability to a government actor. In *Quinn*, the Court addressed the distinctions between the "policymaker" inquiry under which a municipal entity may be held liable, and "[t]he 'decisionmaker' inquiry[, which] addresses who has the power to make official decisions and, thus, be held individually liable."  *Quinn*, 330 F.3d at 1326.  There, a library director alleged that a county administrator fired her in retaliation for exercising her First Amendment rights and sought to impose liability both against the county itself and the administrator in his individual capacity.  *Id.* at 1322.  The administrator argued that because his determination was appealed to and affirmed by the independent

---

[101] *Id.* at 28.

Career Services Council, there was no causal link between the "alleged retaliatory animus" and the director's eventual termination.  *Id.* at 1326.  The court cautioned that "conflation of the 'final policymaker' and 'decisionmaker' inquiry would lead to untenable consequences." *Id.*  Where, as in that case, the individual sought to be held liable "had the authority not merely to *recommend* . . . termination but to immediately effectuate" it, subject to an appeal by the terminated individual, the municipality would not be liable, but the individual officer was an "official decisionmaker" and, thus, as a matter of law *could* be liable.  *Id.*  (emphasis in original).

Subsequently, in an unpublished decision, the Eleventh Circuit squarely addressed the contention that non-decisionmaking officials could be held liable for their recommendations to a purportedly acquiescent actual decisionmaker on a theory identical to what plaintiff argues.  "In the termination context, a 'decisionmaker' has the power to terminate an employee, not merely the power to recommend termination." *Kamensky*, 148 Fed. Appx. at 879 (citing *Quinn*, 330 F.3d at 1328).  In *Kamensky*, the individual defendant "had no power to terminate [the plaintiff,] but rather only had the power to recommend her termination." *Id.* at 880.  Such an individual is "not the 'official decisionmaker,' and thus cannot be held liable." *Id.*  The cases upon which the plaintiff in *Kamensky* had relied for his "rubber stamp"

theory were the delegation and ratification cases described above.  *Id.* (citing *Holloman*, 370 F.3d at 1290-94 (involving delegation of actual decisionmaking authority appealable to a board and holding municipality could be liable because appeal to delegating final policymaker was practically unavailable); *Matthews*, 294 F.3d at 1296-98 (rejecting assertion that retaliatory motive on the part of one member of City Council should be imputed to final policymaker based upon either delegation or ratification theories)).  In those cases, the Eleventh Circuit had examined the bases upon which retaliatory animus on the part of an individual decisionmaker could be imputed "upstream" to the municipality *via* a final policymaker's approval of a termination decision.  *Id.*  By contrast, the plaintiff in *Kamensky* sought to have the termination decision imputed "downstream" to an individual non-decisionmaker who recommended termination based upon retaliatory animus.  The court held:  "We have not extended this line of cases to individual liability, and refrain from doing so here." *Id.*; *see also, e.g.*, *Poppy v. City of Willoughby Hills*, 96 Fed. Appx. 292, 294-95 (6th Cir. 2004) (rejecting "rubber stamp" contention and holding that "[b]ecause the Mayor was not the decisionmaker, he cannot be held liable under § 1983 for the City Council's decisions regarding [plaintiff's] terms and conditions of employment"); *Sinclair v. Town of Yankeetown*, No. 1:07-CV-035-SPM, 2008 WL 660089, at *2 (N.D. Fla. Mar. 7, 2008) (holding that mayor could not be individually liable even

36

though mayor recommended termination to the town council, because "the final decision was up to the council members"); *Redding v. Tuggle*, No. CIVA105CV-2899WSDLTW, 2007 WL 2462641, at *28 (N.D. Ga. July 11, 2007) ("The power to recommend, however, does not impose individual liability under § 1983, even if the recommendation is merely given a 'rubber stamp.'"); *Sanders v. City of Selma*, No. Civ.A.04-753 B, 2005 WL 3411342, at *4 (S.D. Ala. Dec.13, 2005) (holding that mayor could not be individually liable because City Council, rather than mayor, was the decisionmaker, even if Council simply "rubber-stamped" mayor's recommendation).

Even were this court to accept that there may exist situations in which the influence of a non-decisionmaker over a decisionmaker is so overwhelming that the non-decisionmaking government official may be held individually liable under § 1983, this is not one of them.  For the reasons laid out above, the court is wholly convinced that the personnel committee of the City Council undertook an unusually extensive and transparent independent investigation into the advisability of terminating plaintiff.[102]   Plaintiff has not contended that a majority of the

---

[102] It is worth noting that the City of Hanceville Employee Handbook, which plaintiff submitted as evidence, states on its very first page that:  "All employees are 'At-Will' employees . . . ." Doc. no. 53, Ex. 6, at 1.  The same is repeated at the top of the disciplinary procedures provision under the aegis of which the City Council personnel committee held plaintiff's disciplinary hearing and, ultimately, recommended his termination to the Council as a whole.  *Id.* at 20 ("All employees are employed 'At-Will' and may be terminated, demoted, suspended, or transferred *by the City with*

councilmembers voting in favor of the termination even knew of any alleged untoward motive for Mayor Whitley's recommendation, much less that they approved of such a motive.   Plaintiff simply recycles his argument that he has testimony to suggest that the Council generally agreed with the Mayor, and that some of the councilmembers knew that plaintiff had already been disciplined for some of the reasons that supported his termination.   Again, for the same reasons stated above, these assertions are entirely insufficient to show that the Council adopted any unconstitutional motive Mayor Whitley may have had, or made what was obviously a contentious political decision without exercising their own powers of reason. Viewing the facts in the light most favorable to plaintiff, it is pellucidly clear that plaintiff was treated shoddily by Mayor Whitley.   Equally clear, however, is the conclusion that, even viewing the evidence in his favor, his termination was not

---

*or without cause.*   Such disciplinary procedures are within the sole discretion of the City.") (emphasis supplied).   *Cf. Locurto v. Giuliani*, 447 F.3d 159, 173 (2d Cir. 2006) ("First Amendment retaliation doctrine must reconcile our dual traditions of at-will employment and of robust license to speak freely without Government sanction . . . .");   *McKinley v. Kaplan*, 262 F.3d 1146, 1151 (11th Cir. 2001) (recognizing that First Amendment retaliation law necessarily must strike a balance between the public benefits of at-will government employees and protection of speech as a citizen). Therefore, the Council *needed no reason to terminate plaintiff*, and may have done so for any reason at all, provided *the actual decisionmaker* did not possess an unconstitutional motive for plaintiff's termination.   In this respect, plaintiff's argument that the bases for plaintiff's termination were insufficient to support it because he had already been disciplined for those violations and had not repeated them are an abject nullity.   Even if the Council had no reason at all, no constitutional violation would have occurred *in his termination*, even if recommended with retaliatory animus. Therefore, no violation could be imputed back to plaintiff.   This court believes, though no court appears yet to have examined the issue, that this is an independent reason why an "upstream rubber stamp" theory is illogical.

unconstitutional.  A termination that was not unconstitutional, because not itself based upon unconstitutional motives, does not become so simply because the recommending government official may have possessed an unconstitutional motive. Therefore, even accepting the dubious proposition that plaintiff's reverse "cat's paw" theory has application in this Circuit in rare instances, it has no application here.

For these reasons, Mayor Whitley's motion for summary judgment as to plaintiff's claim against her pursuant to § 1983 is due to be granted.

### 3.    Plaintiff's remaining defamation claim

Having determined that summary judgment is due to be granted as to all of plaintiff's federal law claims, the court declines to exercise supplemental jurisdiction over the remaining state-law claim plaintiff asserts in Count IV of his complaint. Pursuant to 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." *Id.*  Further, the Eleventh Circuit has regularly reiterated that "'if the federal claims are dismissed prior to trial, [the Supreme Court's decision in *United Mine Workers v.*] *Gibbs*[, 383 U.S. 715 (1966)], strongly encourages or *even requires dismissal* of state claims.'"  *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119 (11th Cir. 1999) (emphasis supplied) (alterations supplied) (quoting *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (citing *Gibbs*, 383 U.S.

39

at 726)).   Plaintiff's defamation claim against the individual defendants will, therefore, be dismissed without prejudice.

## IV.  CONCLUSION AND ORDER

In accordance with the foregoing, the City's motion for summary judgment and the individual defendants' motion for partial summary judgment[103] are due to be, and the same hereby are, GRANTED with respect the claims plaintiff has asserted under 42 U.S.C. § 1983, contained in Count I of the original complaint.[104]  Accordingly, all of plaintiff's federal-law claims are DISMISSED with prejudice.   Additionally, plaintiff has abandoned all of his state-law claims against the City[105] and, *in toto*, the state-law claims of civil conspiracy and intentional emotional distress contained in Counts II and III of plaintiff's complaint[106] and, thus, they too are DISMISSED with prejudice.   Further, because the court, pursuant to 28 U.S.C. § 1367(c), declines to exercise supplemental jurisdiction over the remaining state-law defamation claim against the individual defendants, contained in Count IV of the complaint,[107] that claim is hereby DISMISSED without prejudice.   Costs incurred herein are taxed to

---

[103] Doc. no. 42 (Defendant City of Hanceville's Motion for Summary Judgment); doc. no. 43 (Motion for Partial Summary Judgment by Katie Whitley, Hubert Jones, and Wayne Armstrong).

[104] Doc. no. 1 (Original Complaint), ¶¶ 34-39.

[105] *See* Plaintiff's Response to the City's Motion for Summary Judgment, at 25.

[106] *Id.* ¶¶ 40-47.

[107] *Id.* ¶¶ 48-50.

plaintiff.  The Clerk is directed to close this file.

    DONE and ORDERED this 24th day of February, 2011.

                                              _____
                                              United States District Judge